In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00188-CR**
**NO. 09-17-00189-CR**
**NO. 09-17-00190-CR**

_____

**ELIAS ARTEAGA-ROMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 16-07-08022-CR, 16-07-08242-CR, 16-05-05329-CR**

**MEMORANDUM OPINION**

A jury convicted appellant Elias Arteaga-Roman of two charges of aggravated sexual assault of a child and one charge of injury to a child. The jury assessed punishment at thirty years of confinement for aggravated sexual assault of a child in trial cause number 16-07-08022-CR, thirty years of confinement for aggravated assault of a child in trial cause number 16-07-08242-CR, and four and a half years of confinement for injury to a child in trial cause number 16-05-5329-CR. In five

1

issues, Arteaga-Roman challenges the legal sufficiency of the evidence and the denial of his motion for mistrial, and he argues that his punishment in the aggravated sexual assault cases was cruel and unusual. We affirm the trial court's judgments.

PERTINENT BACKGROUND

The indictments alleged that Arteaga-Roman intentionally or knowingly caused the sexual organ of K.A., a child younger than fourteen, to "contact and/or penetrate" his mouth, penetrated K.A.'s sexual organ by inserting his hand and intentionally or knowingly caused bodily injury to D.B., a child younger than fourteen, "by applying pressure to D.B.'s nose with a cloth or similar object[.]"

V.B., Arteaga-Roman's former wife and the mother of the child victims, testified that she, Arteaga-Roman, and the children were living together after the divorce, but she and Arteaga-Roman slept in separate rooms. V.B. testified that at the time of the offenses, D.B. was eight years old and K.A. was six years old. V.B. explained that on the date of the offense, she had left to go to her current partner's house and then to work. According to V.B., D.B. called her and said she had been awakened with a rag on her face. V.B. believed D.B. had experienced a nightmare, and she told D.B. to rest because it was just a nightmare. V.B. testified that D.B. called her again, and after hearing what D.B. had to say, she immediately returned home.

2

Upon arriving at the trailer, V.B. pulled in sideways so Arteaga-Roman would not see the lights of the truck. V.B. explained that she did not want Arteaga-Roman to see the lights because D.B. had told her that she was afraid Arteaga-Roman would awaken, and V.B. testified that she was also afraid. When V.B. entered the trailer, she took D.B. outside, and she testified that D.B. was scared and crying. After speaking with D.B., V.B. called the police. V.B. testified that the police and an ambulance arrived, and the police questioned them before entering the trailer to get Arteaga-Roman. According to V.B., K.A. was eventually taken from the house by V.B. and the emergency medical technicians (EMTs), and the EMTs checked both K.A. and D.B. in the ambulance before taking them to the hospital.

According to V.B., when they arrived at the hospital, K.A. indicated that she wanted to tell V.B. something. K.A. asked V.B. why her father had done what he did, and K.A. told her mother that her father had "tickled her and given her little kisses in her part." V.B. testified that she understood K.A. to be referring to her intimate part, which meant her sexual organ. V.B. explained that K.A. said her father had tickled her private intimate part with his mustache. The next day, K.A. and D.B. were interviewed separately at Children's Safe Harbor. V.B. testified that she then sought counseling for the girls at Safe Harbor. V.B. testified that after the offenses, D.B. "had a lot of nightmares[,]" and K.A. wanted her mother to hug her throughout

3

the night. According to V.B., Arteaga-Roman asked her to talk to the victims about saying that the charges were untrue. V.B. also testified that in a letter to D.B., Arteaga-Roman had told D.B. to lie and say that she had made a mistake.

Deputy Nicholas Cook of the Montgomery County Sheriff's Office testified that he was dispatched to a "child abuse call" at V.B.'s home in the early morning hours of April 28, 2016. Cook explained that V.B. informed him that one of the children had "called her and told her that some inappropriate things had happened between the father and the two daughters." Cook testified that V.B. spoke in broken English, so he had a Spanish-speaking deputy with him at the scene. After V.B. told Cook what D.B. had told her, Cook and his supervisor entered the trailer to make contact with Arteaga-Roman, and they found him asleep in the bedroom. Cook testified that Arteaga-Roman seemed disoriented and intoxicated, Cook could smell alcohol, and "[t]here were some alcoholic beverages in the area." Cook explained that, because of the severity of the language barrier, he did not ask Arteaga-Roman specific questions, and he instead called a detective to come to the scene. The detective advised Cook by telephone to do a DNA swab of Arteaga-Roman, and Cook did so. Cook testified that D.B. told the police that her father placed a cloth over her mouth, which caused her "pain and discomfort in her mouth and her nose area."

4

Detective Shannon Acosta of the Montgomery County Sheriff's Office testified that she is assigned to the Crimes against Children division, where she investigates cases of physical and sexual abuse of children who are age thirteen and under. Acosta explained that she was assigned to the case involving Arteaga-Roman because she was on call when Deputy Cook called from the scene. Acosta testified that Cook informed her that Arteaga-Roman had put a rag with a substance on it over one child's face, and "there was also an outcry of oral contact to another child's genitalia." Cook informed Acosta that he had been unable to locate the cloth.

Acosta instructed Cook by phone to swab Arteaga-Roman's face for any possible DNA transfer and to obtain consent to search the house, and she authorized examinations for the children with a sexual assault nurse. Acosta explained that when she arrived at the scene, she met with Deputy Aguirre, who walked her through the scene and pointed out some potentially key pieces of evidence, such as a lighter and a bottle of rubbing alcohol in the master bedroom. Acosta stated that the lighter was significant because the children mentioned that Arteaga-Roman had displayed it, and the bottle of rubbing alcohol was significant because "the rag that was over [D.B.'s] face smelled to her like rubbing alcohol." Acosta testified that upon lifting the lid on the trash can next to the porch outside, she saw a pink rag on top of the trash, and she photographed the rag and collected it as evidence. According to

5

Acosta, when she lifted the rag out of the trash, she noticed that the rag "had an overwhelming smell of rubbing alcohol." Acosta also found Acosta-Roman's police identification from Mexico. Acosta testified that after securing the evidence at the crime lab, she went to the hospital where the children were.

After Arteaga-Roman was arrested, Acosta obtained help from Deputy Aguirre to interview Arteaga-Roman because Acosta does not speak Spanish fluently. Acosta and Aguirre interviewed Arteaga-Roman in Spanish, and Acosta recorded the interview with her digital recorder. According to Acosta, D.B. had told her that she woke up when it felt like someone was trying to put something over her mouth. Acosta explained that Arteaga-Roman claimed that he did not do anything and did not know who covered up D.B.'s face, although no one else was at home. Acosta testified that Arteaga denied touching the children or walking around naked, and he told the police that the children must have been dreaming. According to Acosta, Arteaga-Roman stated that he had consumed eight to ten beers. Arteaga-Roman consented to a buccal DNA swab, and Acosta took a sample from him. Acosta asked Arteaga-Roman to provide a written statement, and she explained that with the exception of Arteaga-Roman saying that he had lain down with the children, his written statement was "pretty consistent[]" with his oral statement.

Acosta testified that the next day, she watched the forensic interviews of D.B. and K.A. at Children's Safe Harbor via a closed circuit television in an adjoining room. Acosta explained that the children were interviewed separately. As a result of the interviews with D.B. and K.A., Acosta initiated charges against Arteaga-Roman for injury to a child as to D.B. and aggravated sexual assault of a child or indecency with a child as to K.A. Acosta testified that when she attempted to interview Arteaga-Roman again, he did not want to speak with her. Defense counsel objected that Acosta's testimony constituted a comment on Arteaga-Roman's right to remain silent, and he requested a jury instruction and moved for a mistrial. The trial judge denied the motion for mistrial, but did instruct the jury to disregard the last question and answer.

Acosta testified that she received a call from D.B.'s therapist, which caused Acosta to become concerned about D.B. being told to recant. Acosta testified that she filed the case with the district attorney's office, and the charges she turned in included two counts of aggravated sexual assault of a child as to K.A. for making oral contact with K.A.'s genitalia and for penetrating her genitalia with his hand. Acosta explained that when the rag was analyzed, it tested "positive for the same type of alcohol that is in the rubbing alcohol."

Sexual assault nurse examiner Karin Hoffmann testified that she conducted sexual assault examinations of K.A. and D.B. According to Hoffmann, when she took D.B.'s history, V.B. was not in the room. Hoffmann testified that D.B. reported that Arteaga-Roman entered her room and removed his pants and shirt, so that he "had nothing on." Hoffmann explained that D.B. stated her father put a towel that smelled like medicine into her nose and mouth. According to Hoffmann, D.B. stated that when she asked her father what he was doing, he told her to go back to sleep because she was having a nightmare. D.B. told Hoffmann that when she opened her eyes, her father "was standing there and touching his part, as she pointed to her genitalia." According to Hoffmann, D.B. said that Arteaga-Roman got into K.A.'s bed.

Hoffmann explained that as D.B. gave her history, D.B. kept eye contact and spoke fluently and without hesitation. Hoffmann described D.B. as very talkative and "[v]ery protective of her sister and her mom." According to Hoffman, because D.B. reported that Arteaga-Roman tried to give her medicine, she ordered an evidence collection, which came back negative.

Hoffmann testified that she examined K.A., who was six years old at the time. According to Hoffmann, K.A. stated, "I hear[d] my sister yell, get away. My dad was next to me in my bed. He had nothing on, no clothes." Hoffmann explained that

8

if an adult male put his lips on a child's sexual organ or opened the genitalia with his hand, she would not necessarily expect to find any injury upon examining the child's genitalia. Hoffmann testified that she collected evidence from inside K.A.'s mouth, perianal area, labia majora, and labia minora, and she also collected K.A.'s underwear. During cross-examination, Hoffmann agreed that nothing in either child's account to her described an aggravated sexual assault.

Stephanie Ventura, a bilingual forensic interviewer at Children's Safe Harbor, testified that she interviewed D.B. and K.A. According to Ventura, D.B. is smart and she "talked a lot." Ventura explained that D.B. said "her dad had raped her little sister." D.B. told Ventura that Arteaga-Roman put an alcohol-soaked rag onto her nose "and squeezed it hard to where she couldn't breathe." D.B. told Ventura that she pushed Arteaga-Roman off, and he left the room, but returned to the room naked. According to Ventura, D.B. stated that her father had lifted her sister's nightgown, moved her sister's underwear, and kissed her sister's sexual organ. Ventura testified that K.A. said that her father had lifted her nightgown and moved her underwear, and she could feel his mouth. K.A. told Ventura that her father opened her sexual organ with his hands. During cross-examination, Ventura testified that at one point, K.A. testified that her sister told her that their father tried to rape them.

9

Amanda Balasko, a forensic scientist with the Texas Department of Public Safety, testified that she examined swabs from a rag, blue lighter, and a bottle of rubbing alcohol, as well as buccal swabs and swabs of Arteaga-Roman's face and mouth area, and sexual assault kits from the victims. Balasko explained that she also tested perianal swabs, swabs of the outer and inner labia majora, and labia minora, as well as some panties. Balasko did not detect semen from the panties. Jennifer Young, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Houston, explained that she recovered a DNA profile from outside the panties that was a mixture of three individuals: K.A., Arteaga-Roman, and an unknown unrelated third individual. Young testified that with respect to the testing she performed of the inside of the panties, the contributors were K.A. and Arteaga-Roman.

K.A. testified that her father touched her part, and she explained that she meant the front part of her genitalia. When shown a diagram, she circled the female sexual organ. K.A. recounted that she could feel Arteaga-Roman tickling her part that she circled on the diagram with his mouth and mustache. K.A. testified that she kept her eyes closed and did not see whether Arteaga-Roman was clothed. According to K.A., on the night of the offense, she was wearing a nightgown and underwear, and Arteaga-Roman lifted her nightgown to her belly button and pushed

her underwear to the right with his hand. K.A. testified that when Arteaga-Roman was tickling her part, he used a lighter so he could see her. K.A. testified that she did not see the lighter, but she heard Arteaga-Roman trying to click it on. K.A. agreed that when Arteaga-Roman was moving her underwear, his hand touched inside the fatty outer part of her genitalia. According to K.A., when Arteaga-Roman moved her underwear, he then put his lips on her part and tickled it with his mouth. K.A. testified that she lowered her nightgown in an attempt to cover herself, "but he continued doing it."

K.A. stated that she heard her sister yelling at Arteaga-Roman and telling him to go back to his room. K.A. identified Arteaga-Roman in court as the person who put his hand in her part and his mouth on her part. K.A. testified that she went back to sleep after Arteaga-Roman left. K.A. explained that she forgot to tell the interviewer some things.

D.B. testified that Arteaga-Roman awakened her by tickling her foot and told her that he was taking care of her younger sister and brother so they would not have nightmares. D.B. explained that she told him she would take care of them, and she attempted to put a large, heavy bucket of clothes in front of the bedroom door to prevent him from reentering the room. According to D.B., Arteaga-Roman put a rag with alcohol on it on her face, covered her nose with the rag, and applied pressure,

11

causing her to have trouble breathing. D.B. testified that she tried to remove the rag and hit Arteaga-Roman.

According to D.B., her father eventually went outside to drink more, and he later asked D.B. to come to the phone to speak to her mother. D.B. explained that she was afraid to tell her mother what had happened, so she did not, and she returned to her room to sleep as her mother had told her to do. D.B. testified that when she laid down, her father reentered the bedroom without any clothes and laid down beside K.A. D.B. testified that she told her father to leave, but he did not, and D.B. saw Arteaga-Roman on top of K.A. kissing her "middle part." D.B. explained that by middle part, she meant the area used for peeing, and she circled the female sexual organ on a diagram. According to D.B., Arteaga-Roman moved her sister's underwear with his hand.

D.B. testified that she did not say anything when her father was doing this because she was afraid, and when the prosecutor asked her why she was afraid, she testified "Because when I was 3 years old, I don't remember what I did, but he hit me so hard." Defense counsel objected to the testimony on the grounds that it was evidence of an extraneous offense and moved for a mistrial, and the trial judge sustained the objection but denied the motion for mistrial. The judge instructed the jury to disregard D.B.'s statement. D.B. testified that after her father left the room,

she called her mother and told her what happened. Defense counsel again moved for a mistrial when D.B. responded in Spanish to questions regarding her parents' divorce, and the trial judge again overruled the motion.

Arteaga-Roman testified that although he and V.B. were divorced, they agreed to live together to allow the children to have both parents in their home, and Arteaga-Roman gave financial assistance to V.B. According to Arteaga-Roman, on the date in question, V.B. left for work in the early morning hours. Arteaga-Roman explained that he had consumed eight beers that evening. Arteaga-Roman testified that he awakened at 2:00 or 3:00 a.m., went to the bathroom, and disinfected himself using a rag with alcohol. According to Arteaga-Roman, he then went into the children's bedroom to check on them. Arteaga-Roman testified that he then fainted and fell on top of D.B., and the rag fell onto her face. According to Arteaga-Roman, he fell onto K.A.'s legs and his head ended up on K.A.'s sexual organ. Arteaga-Roman testified that D.B. woke up and told him to leave her sister alone.

Arteaga-Roman denied touching any part of K.A.'s body with sexual intent or having sexual feelings toward K.A. In addition, Arteaga-Roman denied moving K.A.'s panties with his hand. According to Arteaga-Roman, the "tickling that [K.A.] felt" occurred because he fell onto her private part and he was "shaking." Arteaga-Roman testified that K.A. was lying when she said that he pushed up her gown.

13

Arteaga-Roman explained that although he fainted, he knew everything that occurred while he was in the children's bedroom. Arteaga-Roman denied intentionally putting a rag over D.B.'s nose. Arteaga-Roman admitted that he did not mention dizziness in his statement to the detective.

ISSUES ONE, TWO, AND THREE

In issue one, Arteaga-Roman asserts that the evidence was legally insufficient to prove that he committed the offense of aggravated sexual assault against K.A. by causing her sexual organ to contract or penetrate his mouth. In issue two, Arteaga-Roman argues that the evidence was legally insufficient to prove that he committed the offense of aggravated assault of K.A. by causing the penetration of her sexual organ by inserting his hand. In issue three, Arteaga-Roman contends the evidence was legally insufficient that he committed the offense of injury to a child against D.B. We address these issues together.

When evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n. 19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the ultimate authority on the

credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). A reviewing court must give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 889 n. 13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for aggravated sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (West Supp. 2017) (providing that a child's testimony alone is sufficient to support a conviction for aggravated assault when the child is under the age of seventeen at the time of the alleged offense); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

Section 22.021 of the Penal Code provides that a person commits aggravated sexual assault if he intentionally or knowingly causes the penetration of the sexual

organ of a child by any means or causes the child's sexual organ to contact or penetrate the person's mouth. Tex. Penal Code Ann. § 22.021(a)(1)(B) (West Supp. 2017). Section 22.04 of the Penal Code provides that a person commits the offense of injury to a child if he intentionally or knowingly causes bodily injury to a child. *Id*. § 22.04(a)(3) (West Supp. 2017). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id*. § 1.07(a)(8) (West Supp. 2017). Obstructing or impeding a person's normal breathing is a bodily injury that impairs a person's physical condition. *Marshall v. State*, 479 S.W.3d 840, 844 (Tex. Crim. App. 2016).

K.A. testified that Arteaga-Roman touched her sexual organ with his mouth. In addition, K.A. agreed that Arteaga-Roman's hand touched inside her sexual organ when he was moving her underwear. D.B. testified that Arteaga-Roman put a rag over her nose and applied pressure, which caused her to have trouble breathing. Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority regarding the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable factfinder could have found Arteaga-Roman guilty of injury to D.B. and two counts of aggravated sexual assault of a child as to K.A. *See* Tex. Penal Code §§ 22.021(a)(1)B, 22.04(a)(3); Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *see also Marshall*, 479 S.W.3d at 844; *Brooks v.*

*State*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Penagraph*, 623 S.W.2d at 343; *Tear*, 74 S.W.3d at 560. The evidence is legally sufficient to support Arteaga-Roman's convictions. Accordingly, we overrule issues one, two, and three.

ISSUE FOUR

In issue four, Arteaga-Roman argues that the trial court erred by denying his motion for mistrial after D.B. testified regarding an extraneous offense. We review the denial of a motion for mistrial under an abuse of discretion standard. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). Mistrial is only appropriate for errors that are highly prejudicial and incurable. *Id*. Instructing the jury to disregard generally cures any error associated with testimony referring to an extraneous offense. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Campos v. State*, 589 S.W.2d 424, 428 (Tex. Crim. App. 1979). When, as here, a trial court instructs the jury to disregard certain testimony, we generally presume that the jury followed the trial court's instructions. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). As discussed above, the trial judge sustained defense counsel's objection and instructed the jury to disregard D.B.'s statement regarding the extraneous offense. Therefore, we conclude that the trial court did not abuse its discretion by denying the motion for mistrial. *See Simpson*, 119 S.W.3d at 272;

17

*Kemp*, 846 S.W.2d at 308; *Campos*, 589 S.W.2d at 428. Accordingly, we overrule issue four.

ISSUE FIVE

In his fifth issue, Arteaga-Roman argues that his punishment was cruel and unusual and "disproportionate to the nature of the violations." *See* U.S. Const. amends. VIII, XIV. Generally, a sentence that is within the range of punishment established by the Legislature will not be disturbed on appeal and is not unconstitutionally cruel and unusual. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984); *Kirk v. State*, 949 S.W.2d 769, 772 (Tex. App.—Dallas 1997, pet. ref'd).

The record does not demonstrate that Arteaga-Roman presented his complaints to the trial court. *See* Tex. R. App. P. 33.1(a). However, even if Arteaga-Roman had preserved his complaints for appellate review, his sentences of thirty years of confinement for each of the two counts of aggravated sexual assault of a child and four and a half years of confinement for injury to a child are within the statutorily-authorized ranges of punishment for the charged offenses. *See* Tex. Penal Code Ann. § 22.021(e) (West Supp. 2017) (aggravated sexual assault of a child is a first-degree felony); *Id*. § 22.04(f) (West Supp. 2017) (injury to a child is a third-degree felony); *see also* Tex. Penal Code Ann. § 12.32 (West 2011) (first-degree

18

felony punishment range is five to ninety-nine years of confinement and a fine of up to $10,000); *Id.* § 12.34 (West 2011) (third-degree felony punishment range is two to ten years of confinement and a fine not to exceed $10,000). In addition, the record contains no evidence "reflecting sentences imposed for similar offenses on criminals in Texas or other jurisdictions by which to make a comparison." *Jackson v. State*, 989 S.W.2d 842, 846 (Tex. App.—Texarkana 1999, no pet.). The absence of such evidence renders this Court unable to perform a proportionality analysis. *See generally Solem v. Helm*, 463 U.S. 277, 292 (1983); *Davis v. State*, 905 S.W.2d 655, 664-65 (Tex. App.—Texarkana 1995, pet. ref'd). For all of these reasons, we overrule issue five. Having overruled each of Arteaga-Roman's issues, we affirm the trial court's judgments.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on March 29, 2018
Opinion Delivered May 23, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.